IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ROLANDO M. ZUNIGA, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-07-3358 |
| | § | |
| MICHAEL J. ASTRUE, | § | |
| COMMISSIONER OF THE SOCIAL | § | |
| SECURITY ADMINISTRATION, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM AND ORDER DENYING
## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Before the Court in this social security appeal is Plaintiff's Motion for Summary Judgment, Brief in Support, and Response to Defendant's Motion for Summary Judgment, (Document Nos. 34 and 36), and Defendant's Cross-Motion and Brief in Support of Summary Judgment (Document Nos. 33). Having considered the Plaintiff's Motion for Summary Judgment, Brief in Support, and Response; Defendant's Cross-Motion and Brief in Support; the administrative record; and the applicable law, the Court ORDERS, for the reasons set forth below, that Defendant's Motion for Summary Judgment is GRANTED, Plaintiff's Motion for Summary Judgment is DENIED, and the decision of the Commissioner of the Social Security Administration is AFFIRMED.

## I.      Introduction

Rolando M. Zuniga ("Plaintiff") brings this action pursuant to Section 205(g) of the Social Security Act ("Act"), 42 U.S.C. § 405 (g), seeking judicial review of an adverse final decision of the Commissioner of the Social Security Administration ("Commissioner") denying his application for

disability insurance benefits.  Plaintiff argues that the Administrative Law Judge's ("ALJ") decision is flawed because: (1) the ALJ erred in his assessment of Plaintiff's credibility in determining the extent of Plaintiff's limitations and RFC and (2) the ALJ applied incorrect legal standards in assessing Plaintiff's residual functional capacity ("RFC") by disregarding testimony presented by the vocational expert.  The Commissioner, in contrast, contends that there is substantial evidence in the record to support the ALJ's decision and that the decision comports with applicable law.  Namely, the Commissioner asserts that the ALJ correctly assessed Plaintiff's credibility and properly determined Plaintiff's RFC.

## II.    Administrative Proceedings

On September 17, 2004, Plaintiff applied for disability insurance benefits, claiming an inability to work since February 23, 1998, as a result of a left hand amputation; subsequent arm, shoulder, and neck pain; post-traumatic stress;  major depression; and HIV.  (Tr. 80, 1387, 1414).  The Social Security Administration denied his application at the initial and reconsideration stages.  (Tr. 28, 35, 39).  Plaintiff then requested a hearing before an ALJ.  (Tr. 40).  The Social Security Administration granted his request and the ALJ, William B. Howard, held a hearing on September 27, 2006 .  (Tr. 44, 1391 - 1425). On November 3, 2006, the ALJ issued a decision finding Plaintiff not disabled. (Tr. 24).

Plaintiff sought review of the ALJ's adverse decision with the Appeals Council.  (Tr. 9).  The Appeals Council will grant a request to review an ALJ's decision if any of the following circumstances are present: (1) it appears that the ALJ abused his discretion; (2) the ALJ made an error of law in reaching his conclusion; (3) substantial evidence does not support the ALJ's actions, findings or conclusions; or (4) a broad policy issue may affect the public interest.  20 C.F.R. §

404.970; 20 C.F.R. § 416.1470.  On August 8, 2007, after considering Plaintiff's contentions in light of the applicable regulations and evidence, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner in his case.  (Tr. 6).

Plaintiff filed a timely appeal of the ALJ's decision.  (Document No. 1).  Plaintiff then filed a Motion for Summary Judgment and Brief in Support (Document Nos. 34). The Commissioner filed a Cross Motion for and Brief in Support of Summary Judgment,  to which Plaintiff filed a Reply.  (Document Nos. 33, 33-2, and 26).  This appeal is now ripe for ruling.

## III.    Standard of Review of Agency Decision

The court's review of a denial of disability benefits is limited "to determining (1) whether substantial evidence supports the Commissioner's decision, and (2) whether the Commissioner's decision comports with relevant legal standards." *Jones v. Apfel*, 174 F.3d 692, 693 (5th Cir. 1999). Indeed, Title 42, Section 405(g) limits judicial review of the Commissioner's decision: "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  The Act specifically grants the district court the power to enter judgment, upon the pleadings and transcript, "affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the case for a rehearing" when not supported by substantial evidence.  42 U.S.C. § 405(g). While it is incumbent upon the court to examine the record in its entirety to decide whether the decision is supportable, *Simmons v. Harris*, 602 F.2d 1233, 1236 (5th Cir. 1979), the court may not "reweigh the evidence in the record, nor try the issues de novo, nor substitute [its] judgment for that of the [Commissioner] even if the evidence preponderates against the [Commissioner's] decision." *Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988); *see also Jones*, 174 F.3d at 693; *Cook v. Heckler*, 750 F.2d 391, 392-93 (5th Cir. 1985).  Conflicts in

the evidence are for the Commissioner to resolve. *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992).

The United States Supreme Court has defined "substantial evidence," as used in the Act, to be "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co., v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).   Substantial evidence is "more than a scintilla and less than a preponderance." *Spellman v. Shalala*, 1 F.3d 357, 360 (5th Cir. 1993).  The evidence must create more than "a suspicion of the existence of the fact to be established, but 'no substantial evidence' will be found only where there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'" *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983).

## IV.    Burden of Proof

An individual claiming entitlement to disability insurance benefits under the Act has the burden of proving his disability. *Johnson*, 864 F.2d at 344.  The Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The impairment must be proven through medically accepted clinical and laboratory diagnostic techniques.  42 U.S.C. § 423(d)(3).  The impairment must be so severe as to limit the claimant in the following manner:

> he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied to work.

42 U.S.C. § 423(d)(2)(A).  The mere presence of an impairment is not enough to establish that one

is suffering from a disability.  Rather, a claimant is disabled only if he is "incapable of engaging in any substantial gainful activity."  *Anthony*, 954 F.2d at 293 (quoting *Milam v. Bowen*, 782 F.2d 1284, 1286 (5th Cir. 1986)).

The Commissioner applies a five-step sequential process to decide disability status:

1.   If the claimant is presently working, a finding of "not disabled" must be made;

2.   If the claimant does not have a "severe impairment" or combination of impairments, [he] will not be found disabled;

3.   If the claimant has an impairment that meets or equals an impairment listed in Appendix 1 of the Regulations, disability is presumed and benefits are awarded;

4.   If the claimant is capable of performing past relevant work, a finding of "not disabled" must be made; and

5.   If the claimant's impairment prevents him from doing any other substantial gainful activity, taking into consideration his age, education, past work experience and residual functional capacity, he will be found disabled.

*Anthony*, 954 F.2d at 293; *see also Legget v. Chater*, 67 F.3d 558, 563 n.2 (5th Cir. 1995); *Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991).  Under this formula, the claimant bears the burden of proof on the first four steps of the analysis to establish that a disability exists. *McQueen v. Apfel*, 168 F.3d 152, 154 (5th Cir. 1999).  If successful, the burden shifts to the Commissioner, at step five, to show that the claimant can perform other work.  *Id.*  Once the Commissioner shows that other jobs are available, the burden shifts, again, to the claimant to rebut this finding. *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990).  If, at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends. *Legget*, 67 F.3d at 564**.**

Here, the ALJ determined that Plaintff was not disabled at step five.  In particular, the ALJ determined that Plaintiff was not presently working (step one); that Plaintiff's left hand and forearm

amputation, major depression, and post traumatic stress disorder were severe impairments (step two); that these conditions, when considered both singly and in combination, did not meet or equal an impairment listed in Appendix 1 of the regulations (step three); that Plaintiff's impairments precluded him from doing his past work (step four); and that Plaintiff's impairments did not prevent him from doing any other substantial gainful activity performed at a light exertional level, taking into consideration his age, education, past work experience and RFC (step five). (Tr. 18-19). In this appeal, the Court must determine whether substantial evidence supports that step five finding, and whether the ALJ used the correct legal standards in arriving at that conclusion, including, whether the ALJ's assessment of Plaintiff's credibility was proper, and whether the ALJ properly considered Zuniga's limitations in assessing his RFC.

In determining whether substantial evidence supports the ALJ's decision, the court weighs four factors: (1) the objective medical facts; (2) the diagnosis and expert opinions of treating physicians on subsidiary questions of fact; (3) subjective evidence of pain as testified to by the plaintiff and corroborated by family and neighbors; and (4) the plaintiff's educational background, work history, and present age. *Wren*, 925 F.2d at 126.

**Discussion**

**A. Objective Medical Facts**

The objective medical evidence shows that Zuniga suffers from left hand and forearm amputation, major depression, and post-traumatic stress disorder.[1]

---

[1]    The Court notes that Plaintiff also suffers from HIV, the diagnosis of which predated injuries and alleged onset of disability by several years. (Tr. 692, 703). The Court agrees with the ALJ's evaluation in that there is nothing in the record suggesting "complications or functional restrictions caused by the claimant being HIV positive." (Tr. 19).

Plaintiff's conditions arose from a February 1998 accident in which his watch was caught on a wire which held pipes together, causing multiple fractures as well as soft tissue debridement. (Tr. 1016). Following re-implantation of the left hand and skin grafting, Plaintiff underwent amputation of the left little finger. (Tr. 248, 373, 478). In November 1999, Plaintiff reported difficulty with sleep and neuropathic pain, and his physician, William H. Donovan, M.D., ("Dr. Donovan") prescribed Elavil. (Tr. 1016-18).

After complaining for a year of pain and non-movement in left hand, Plaintiff had his left hand amputated and received wrist articulation to increase function in his upper left extremity. (Tr. 478). An impairment evaluation at that time placed his hand pain in the 60th percentile range, establishing a severe disability. (Tr. 510). Plaintiff received outpatient therapy for a myolectric prosthesis, reporting difficulty with the prosthesis fit. (Tr. 462). After finishing with his prosthetic training, Plaintiff discontinued working due to fiberglass fumes which made him ill. (Tr. 459). However, Dr. Donovan assessed Plaintiff was "doing quite well." *Id.*

In November 2001, Plaintiff reported no complaints, apparently due to physical therapy, and requested a back-up prosthesis in case his primary prosthesis broke during a welding class. (Tr. 431, 450-51). Plaintiff ceased attending class reportedly due to pain in his shoulder and neck area. (Tr. 431). Plaintiff obtained a job cleaning luggage carousels at an airport, but quit once again due to neck and shoulder pain. (Tr. 431). Kate Hughes, P.T., M.S., O.C.S., ("Hughes") performed a functional capacity evaluation in April of 2003 - she reported Plaintiff could not push or pull weight greater than sixty pounds, could not carry objects overhead, and could not reach above shoulder level. (Tr. 431). Hughes evaluated Plaintiff as possessing the ability to perform medium-level work at that time, with a good endurance level. (Tr. 431-32). Hughes recommended Plaintiff return to

work with restrictions of not lifting or carrying more than thirty to thirty-five pounds on a regular basis, not lifting greater than fifty pounds on a regular basis, not performing work above shoulder level, and not pushing or pulling greater than sixty pounds.  (Tr. 432).

In August of 2004, Carol J. Oakley, D.C.,C.C.S.T., ("Dr. Oakley"), Plaintiff's chiropractor, referred Plaintiff to a surgeon for an amputation below the left elbow.  (Tr. 767).  In a September letter, Dr. Oakley stated Plaintiff was "permanently disabled and has not been able to work since [February 28, 1998] due to work-related accident" and that "due to his condition he is unable to work at any job at any capacity at this time."  (Tr. 760).   In a consultation with the amputation surgeon, David H. Hildreth, M.D., ("Dr. Hildreth"), Plaintiff claimed he continued to experience arm pain and difficulty with his prosthesis.  (Tr. 778-79).

On November 19, 2004, Plaintiff underwent another operation, having his left arm amputated from the elbow down, in order to reduce pain and improve his prosthetic fitting.  (Tr. 779, 783).  Dr. Oakey stated in a November 2004 evaluation letter that, despite Plaintiff's best efforts to return to work, his pain prevented him from doing so.  (Tr. 737).  Dr. Oakley opined that Plaintiff suffered from "depression, left shoulder pain, left arm pain, neck pain, headaches, mid back pain, and left leg pain."  (Tr. 737).

The following month, Donald Gibson II, M.D., P.A., ("Dr. Gibson") examined and evaluated Plaintiff's condition.  (Tr. 798).  Dr. Gibson observed Plaintiff experienced only mild pain in the right shoulder and right wrist, and retained normal left shoulder function.  *Id.*  Dr. Gibson noted Plaintiff took three Hydrocodone tablets each day for pain.  *Id.*  He described Plaintiff as "a pleasant man in no apparent distress," and observed no major problems with his neck or back.  (Tr. 799).  He assessed Plaintiff's joint pains as mild.  *Id.*  He found no limitation of movement, and stated Plaintiff

retained the ability to sit, stand, and walk without difficulty.  *Id.*

In December of 2004, Plaintiff received an RFC evaluation based on a review of the record. (Tr. 805).  The evaluator determined Plaintiff could occasionally lift a maximum of twenty pounds, but frequently could only lift a maximum of ten pounds.  (Tr. 806).  The evaluator also assessed Plaintiff could stand, walk, or sit, with normal breaks, a total of six hours in an eight-hour workday. *Id.*  Plaintiff's amputation limited his ability to push or pull in the upper extremities, and Plaintiff could never climb ladders, rope, or scaffolds.  (Tr. 807).  The evaluator found no manipulative, visual, communicative, or environmental limitations, and that Plaintiff's alleged limitations were not fully supported by the evidence on file.  (Tr. 808-10).  In a January worker's compensation report following this RFC evaluation, Dr. Oakley diagnosed Plaintiff with cervicalgia and muscle spasm in addition to areas of hyperesthesia with dermatone areas responding to the nerve root levels of C5, C6, an C7 on Plaintiff's left side. (Tr. 1217-18).

On March 3, 2005, Mark Lehman, Ph.D., ("Dr. Lehman") conducted a psychological evaluation.  Dr. Lehman stated Plaintiff could maintain good grooming and hygiene, prepare his own meals, clean his apartment, use public transportation, and use a telephone.  (Tr. 815).  Plaintiff reportedly often stayed home, as he possessed no energy.  *Id.*  Dr. Lehman opined that Plaintiff's ability to complete tasks might be affected by his depression, and that his condition had likely deteriorated since his accident.  (Tr. 816).  Plaintiff possessed normal thought processes and content, demonstrated no perceptual abnormalities, and presented clear cognition and adequate memory functions.  (Tr. 817).  Dr. Lehman determined Plaintiff suffered from mood disorder due to his overall medical condition, along with depressed features.  (Tr. 818).  However, diagnosis of these features waited upon receipt of documented symptoms.  *Id.*  While Plaintiff obtained a score of fifty on his

global assessment of functioning test ("GAF"), Dr. Lehman opined Plaintiff's depression would likely improve with psychiatric treatment and further medication. *Id.*

Dr. Oakley afterwards referred Plaintiff for another psychological evaluation on March 22, 2005. (Tr. 1162). The examiner observed that Plaintiff's concentration, attention, and memory were intact, with average intellectual functioning. *Id.* Plaintiff reported constant shooting, stabbing and pulling pain, as well as a tingling sensation in his arm. (Tr. 1163). Plaintiff stated that he experienced anxiety relating to his fear of unrelenting pain; he also expressed doubts regarding his ability to obtain work. *Id.* Plaintiff complained of sleep interruption due to pain, as well as low energy and inconsistent appetite. (Tr. 1164). He also reported feeling irritable, depressed, and anxious, but denied any past evaluation or treatment for mental health issues, except those connected to his injury. *Id.*

On the Beck Depression Inventory, Plaintiff achieved a severe level of depression, and on the Pain and Impairment Rating Scale, Plaintiff scored in the significant elevated range. (Tr. 1164). The latter constituted a poor indication for recovery of function, suggesting the possibility that psychological factors contributed to patient's continued impairment. (Tr. 1165). The examiner diagnosed Plaintiff with psychological factors affecting physical conditions, as well as major depressive affective disorder. *Id.* Plaintiff received a score of sixty on a newly administered GAF, indicating moderate to severe symptoms. *Id.* In an addendum evaluating the methods used by this examiner, Phillip Osborne, M.D. ("Dr. Osborne") observed that mental illness precedes chronic pain complaints in 95% of cases. (Tr. 1034). While Plaintiff showed depression on the Beck test, no re-test was given to corroborate this result; the test was also given for admission to a multidisciplinary pain program, which Dr. Osborne opined are generally not effective. (Tr. 1035). Dr. Osborne stated

that the need for psychological counseling would likely not stem from Plaintiff's injury. *Id.*

On March 28, 2005, Plaintiff received another RFC evaluation based on the available record. (Tr. 821). The examiner determined Plaintiff could occasionally lift up to twenty pounds but no more than ten pounds on a frequent basis. (Tr. 822). Plaintiff could stand, sit, or walk for about six hours in an eight-hour workday. *Id.* In contrast to the first RFC, Plaintiff's ability to push and pull was found to be unlimited. *Id.* Plaintiff was precluded from using ladders, ropes, or scaffolds, and the examiner advised against unprotected heights. (Tr. 823). Plaintiff possessed manipulative limitations with regards to gross and fine manipulation, as well as limitations of feeling in his skin receptors. (Tr. 824). Plaintiff had no reaching, visual, or communicative limitations. (Tr. 824-25). Plaintiff also possessed no environmental limitations, other than avoiding moderate or greater exposure to hazards such as machinery or heights. (Tr. 825).

In a record-based Psychiatric Review taken on March 29, 2005, the examiner determined Plaintiff's impairments were not severe, and that Plaintiff had coexisting non-mental impairments requiring referral to another medical speciality. (Tr. 829). The examiner observed that Plaintiff possessed an affective disorder of depressive syndrome, characterized by sleep disturbance, decreased energy, feelings of guilt or worthlessness, and thoughts of suicide. (Tr. 829, 832). The examiner determined the degree of limitation regarding this mental impairment was mild for restriction of daily living, maintaining social function, and maintaining concentration, but there was no limitation regarding episodes of decompensation. (Tr. 839). The examiner opined that Plaintiff possessed a depressed mood with restricted affect, and that Plaintiff could care for personal needs, do household tasks, cook, shop, manage finances, and use public transportation. (Tr. 841). Plaintiff's achieved a GAF score of fifty. *Id.* The examiner determined that Plaintiff's alleged mental limitations caused

by his symptoms were not fully supported by medical and other evidence.  *Id.*

Plaintiff received another psychiatric review from Larry Pollock, Ph.D., ("Dr. Pollock") following the ALJ hearing.  (Tr. 1384, 1422-23).  Dr. Pollock stated that Plaintiff continued to complain of pain, discomfort, tingling, and numbness in his left arm, along with back pain, since his amputation.  (Tr. 1384-85).  Dr. Pollock also observed Plaintiff retained only a limited range of motion, and had difficulty bending, lifting, standing, and sitting for long periods of time.  (Tr. 1385).  Dr. Pollock described Plaintiff as socially withdrawn, and possessing suicidal thoughts.  (Tr. 1387).  Plaintiff had further complained of general sadness and nervousness, as well as constant nightmares and flashbacks, wherein he relived his accident.  *Id.*

Dr. Pollock opined that Plaintiff exhibited good comprehension skills, normal thought processes,  good judgment with problems, and adequate concentration and attention, but noted his general mood was depressed.  (Tr. 1386).  Plaintiff's performance on the EIWA was in the superior range, and Plaintiff obtained an Full Scale I.Q. of 121, which Dr. Pollock believed might constitute an overstatement of his intellectual prowess.  *Id.*  Plaintiff scored 121 on verbal intellectual functioning and nonverbal intellectual functioning, both in the superior range.  *Id.*  Abstract verbal concept formation proved superior; expressive vocabulary, immediate auditory memory, retention of general information and comprehension of social behavior were superior; and numerical reasoning were average.  *Id.*  Alertness to visual detail, visual motor assembly skills, and visual sequential reasoning were high average, while visual motor speed and abstract visual reasoning were average.  *Id.*  Dr. Pollock diagnosed Plaintiff with major depressive disorder and post-traumatic stress disorder.  (Tr. 1387).  Plaintiff also received a GAF of 46 during this evaluation.  (Tr. 1390).

During Plaintiff's September 27, 2006 hearing, the ALJ called on a medical expert ("ME")

to testify as to Plaintiff's medical conditions. (Tr. 1391, 1412). The ME opined that the main difficulty for Plaintiff was his amputation from just below the elbow as a result of Plaintiff's earlier injury. (Tr. 1413). Based on the evidence available since alleged onset of disability, the ME stated Plaintiff could perform light work. (Tr. 1414). The ME noted that there was no evaluation regarding Plaintiff's use of prosethesis and how this might affect his ability to do work. (Tr. 1415). Plaintiff's representative then asked the ME whether the prosthesis might be causing neck and shoulder pain. (Tr. 1415). The ME stated that Plaintiff would still be able to conduct light work, although lifting more than ten pounds might cause some amount of pain. (Tr. 1415-16). Plaintiff's representative suggested more information regarding prosthesis-related pain might be useful in establishing what caused Plaintiff's neck and back pain, to which the ME agreed. (Tr. 1416).

Having examined the objective medical evidence in the record, it is clear that Plaintiff suffers from left hand and forearm amputation, major depression, and post traumatic stress disorder. However, none of the objective medical facts are sufficient to establish that Plaintiff is disabled as defined by the Act. Therefore, the objective medical evidence factor supports the ALJ's decision.

### B. Diagnosis and Expert Opinion

The second element considered is the diagnosis and expert opinions of treating and examining physicians on subsidiary questions of fact. Unless good cause is shown to the contrary, "the opinion, diagnosis and medical evidence of the treating physician, especially when the consultation has been over a considerable length of time, should be accorded considerable weight." *Perez v. Schweiker*, 653 F.2d 997, 1001 (5th Cir. 1981). For the ALJ to give deference to a medical opinion, however, the opinion must be more than conclusory and must be supported by clinical and laboratory findings. *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985); *Oldham v. Schweiker*, 660 F.2d 1078 (5th Cir.

13

1981). Further, regardless of the opinions and diagnoses and medical sources, "'the ALJ has sole responsibility for determining a claimant's disability status.'" *Martinez v. Chater*, 64 F.3d 172, 176 (5th Cir. 1995).

Here, the thoroughness of the ALJ's decision concerning the medical records and weight accorded the opinions of examining and non-examining physicians, shows that he carefully considered the medical records and testimony, and that his determination reflects those findings accurately. The ALJ summarized the evidence and set forth specific reasons concerning the weight given to the opinions of the medical sources, and in particular, the reason for discounting the opinion of Plaintiff's chiropractor, Dr. Oakley. The ALJ wrote:

> In December 2004, the claimant was examined by Donald Gibson, M.D. Dr. Gibson did not detect any signs of neurological or sensory deficits, or evidence of decreased range of motion of the back or neck. He stated the claimant had normal gait and coordination, and did not have any localized sensory loss, muscular weakness, or atrophy. In addition, a peripheral joint examination was normal and showed full range of motion of all joints with no radiculopathy. Based on his findings, Dr. Gibson stated the claimant was able to sit, stand, and walk without difficulty (Exhibit 20F).

> At the hearing, Dr. Hamilton, who is board certified in Orthopedic Surgery, testified that the objective medical evidence does not establish the presence of a medically determinable back or neck impairment. He further stated that the evidence suggested that the claimant is able to sustain light exertional level work.

> The undersigned takes notice that treatment records from Carol Oakley, D.C., in 2005 indicate that the claimant was treated for complaints of neck and back pain. Dr. Oakley diagnosed the claimant with cervicalgia and muscle spasm, and stated he exhibited areas of hyperesthesia with the dermatome areas corresponding to the nerve root levels of C5, C6, and C7 on the left (Exhibit 39F, pages 130-131).

> The undersigned affords little probative weight to Dr. Oakley's opinions. They are not consistent with the clinical findings and opinions of Dr. Gibson, nor are they consistent with the expert medical opinion of Dr. Hamilton. Although Dr. Oakley has treated the claimant, she is not considered to be an acceptable medical source, as defined in 20 CFR 404.1413 and 416.913. Furthermore, Dr. Oakley has not furnished clinical evidence to show that Dr. Gibson's findings are inaccurate. For these reasons,

14

the undersigned gives greater probative weight to the findings and opinions of Dr. Gibson and Dr. Hamilton in determining the claimant's physical residual functional capacity.

Based on the substantial evidence on record, the undersigned concedes that the claimant is limited to physical activity at the light exertional level, and that he cannot use his left upper extremity for more than an assist. Yet, the claimant can use his right upper extremity to perform all the manipulative movements, and can sit, stand and walk for at least six hours each in a normal workday.

In addition to his physical impairment, the evidence documents that the claimant has been diagnosed with depressive disorder and [post-traumatic stress disorder]. In October 2006, Larry Pollock, Ph.D., examined the claimant and stated he had a recurrent depressive disorder of moderate severity, as well as symptoms of [post-traumatic stress disorder]. According to Dr. Pollock, the claimant had a Global Assessment of Functioning (GAF) score of only 46, which is indicative of serious psychologically based limitations in personal, social, or occupational functioning (Exhibit 45F).

However, the medical evidence, including Dr. Pollock's own clinical findings, do not document functional limitations as serious as implied by Dr. Pollock's GAF score. Dr. Pollock noted that the claimant exhibited a normal thought process, good insight and judgment, and that his attention and concentration were adequate without signs of easy distraction. In addition, Dr. Pollock noted the claimant had a measured full scale IQ of 121, which is far better than average (Exhibit 45F).

Earlier clinical findings by Mark Lehman, Ph.D., in March 2006[2] also failed to establish the presence of mental limitations greater than those set forth by the undersigned's residual function capacity assessment set forth in paragraph number 5, above. Dr. Lehman opined that the claimant's GAF score was 50, even though the claimant had a normal thought process, intact memory, and fair insight and judgment (Exhibit 24F).

The claimant's activities of daily living are also inconsistent with incapacitating mental limitations. The claimant can care for his personal and household needs, and can perform errands in public. He testified that he has few social contacts, but that he has one friend with whom he shares his innermost thoughts. He daily spends hours in class with his classmates and teacher(s). He daily spends hours studying at his home. He daily uses public transportation. Such level of functioning is inconsistent with someone who has psychologically based personal, social, or occupational limitations that prevent him from working at any competitive level.

---

[2]    The Court notes that Dr. Lehman's findings actually date to March of 2005.

The ALJ did not err in his assessment of the medical opinions.  The ALJ was not required to rely on Dr. Oakley's medical assessment, as chiropractors are afforded less weight than medical doctors. *Griego v. Sullivan*, 940 F.2d 942, 945 (5th Cir. 1991).  Further, none of the medical opinions submitted support the conclusion that Plaintiff was disabled as a result of  left hand amputation; subsequent arm, shoulder, and neck pain; post-traumatic stress; and major depression.  In light of the medical records submitted, the diagnoses and expert opinions also support the ALJ's decision.

### C. Subjective Evidence of Pain

The third element considered is the subjective evidence of pain, including the claimant's testimony and corroboration by family and friends. Not all pain is disabling, and the fact that a claimant cannot work without some pain or discomfort will not render him disabled. *Cook*, 750 F.2d at 395.  The proper standard for evaluating pain is codified in the Social Security Disability Benefits Reform Act of 1984, 42 U.S.C. § 423.  The statute provides that allegations of pain do not constitute conclusive evidence of disability.  There must be objective medical evidence showing the existence of a physical or mental impairment which could reasonably be expected to cause the pain. Statements made by the individual or his physician as to the severity of the plaintiff's pain must be reasonably consistent with the objective medical evidence of the record. 42 U.S.C. § 423.  "Pain constitutes a disabling condition under the SSA only when it is 'constant, unremitting, and wholly unresponsive to therapeutic treatment,'" *Sellers*, 914 F.2d at 618-19 (citing *Harrell v. Bowen*, 862 F.2d 471, 480 (5th Cir. 1988)).  Pain may also constitute a non-exertional impairment which can limit the range of jobs a claimant would otherwise be able to perform. *See Scott v Shalala*, 30 F.3d 33, 35 (5th Cir. 1994).  The Act requires this Court's findings to be deferential.  The evaluation of evidence

concerning subjective symptoms is a task particularly within the province of the ALJ, who has the opportunity to observe the claimant. *Hames*, 707 F.2d at 166.

At his hearing, Plaintiff first answered questions regarding his date of birth, place of birth, and language proficiency, and afterwards where he had last worked. (Tr. 1396). Plaintiff then described an incident involving muscle contraction in his legs that allegedly prevented him from working further. (Tr. 1397). Plaintiff related that he currently attended school, spending four hours in class on days he attended and studying three to four hours at home. (Tr. 1397-98). Plaintiff stated he lived by himself, washed dishes, did laundry, cleaned his house, shopped for groceries, cooked, and took public transportation. (Tr. 1398-99). Plaintiff reported he took no pain medication, but that he experienced pain in his back and neck. (Tr. 1399). Due to pain in his shoulder and neck, Plaintiff could only lift ten pounds. (Tr. 1400).

When questioned by one of his representatives, Plaintiff complained of pain aggravation from using his prosthesis. (Tr. 1401). The representative then asked Plaintiff if he suffered from depression; Plaintiff responded that he did, and was currently taking Zoloft. (Tr. 1402). Plaintiff also stated he sometimes felt anxious for no reason, forgot things easily, and had previously entertained suicidal thoughts on a daily basis. (Tr. 1402-03). When asked if he had sleep disturbances, Plaintiff complained he could not sleep on a nightly basis and took Ambien to assist this problem. (Tr. 1404).

The ALJ then asked Plaintiff about his schooling; Plaintiff stated he attained a Level 3 grade, the equivalent of a "C." (Tr. 1405). Plaintiff stated he also had nightmares concerning his accident, and that he had difficulty at school as a result of his emotional state. (Tr. 1406). Plaintiff also reported that he stood and stretched four or five times during a four-hour period at school. (Tr.

1407).  The representative asked Plaintiff what activities he participated in prior to his accident, and

the Plaintiff responded that he had run thirty minutes at a time before the accident, but now could not

do so.  (Tr. 1409).  Plaintiff related he had fewer friends, but stated he shared private thoughts with

his best friend.  (Tr. 1410).  Plaintiff also stated that he had isolated himself from other people, and

that crowds and people in authority made him anxious.  (Tr. 1411).

> The ALJ found that Plaintiff testimony was not fully credible.  In doing so, the ALJ wrote:

> In arriving at this physical and mental residual functional capacity, the undersigned has considered the claimant's subjective description of his symptoms and functional limitations.  His testimony regarding debilitating limitations is not credible to the extent alleged.  The claimant alleged he cannot stand or walk for long, but also testified that he ran for exercise for up to 30 minutes at a time.  Significantly, he testified that he takes no pain medications, which is not what one would expect if a person were incapacitated by pain.  The claimant also stated he is socially isolated, yet he also admitted that he has a best friend with whom he shares his innermost thoughts.  Although the claimant may feel depressed, the clinical evidence from Dr. Pollock and Dr. Lehman indicate that his memory is still intact and that he can maintain adequate concentration without being distracted.

> In addition, claimant attends school daily and studies English.  As noted above, he attends class about four hours each weekday.  He then studies at home several hours each day.  He is able to comprehend the subject matter well enough to be making the equivalent of a "C" in English.  See the claimant's testimony (Hearing Notes).  He daily uses the city bus.  These are not the types of activities one would expect from a person who is so mentally incapacitated that he cannot concentrate, persist and maintain pace enough to maintain competitive work, or is unable to function socially at a high enough level to maintain competitive work.

> For these reasons, the undersigned does not find the claimant's testimony to be credible to the extent alleged.  Instead, greater probative weight is given the medical evidence in determining the claimant's residual functional capacity.

(Tr. 19).  Credibility determinations, such as that made by the ALJ in this case in connection with

Padgett's subjective complaints of pain, are generally within the province of the ALJ to make.  *See*

*Greenspan v. Shalala*, 38 F.3d 232, 237 (5th Cir. 1994) ("In sum, the ALJ 'is entitled to determine

the credibility of medical experts as well as lay witnesses and weigh their opinions accordingly.'") (quoting *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985)), *cert denied*, 514 U.S. 1120 (1995). Plaintiff claims the ALJ erred in assessing his credibility and therefore the extent of Plaintiff's complaints of subjective pain.   Specifically, Plaintiff points to the ALJ's incorrect evaluation of Plaintiff's ability to run.  While the ALJ states that Plaintiff's alleged inability to stand or walk is contradicted by the testimony that Plaintiff continues to run for up to thirty minutes, the transcript shows that Plaintiff ran up to thirty minutes *prior* to the accident and alleged onset of disability.

Plaintiff's point is well taken.  However, whether Plaintiff continues to run was not the only factor the ALJ used in assessing Plaintiff's credibility.  The ALJ also cited lack of pain medication, confidential associations despite claimed isolation, the clinical studies of Dr. Pollock and Dr. Lehman, Plaintiff's time spent at and away from school, Plaintiff's grades at school, and Plaintiff's ability to take public transportation in making the credibility assessment.  Had the ALJ incorrectly relied only upon Plaintiff's ability to run up to thirty minutes in determining credibility, that may have constituted reversible error.  However, that is clearly not the case.  Because the record shows that the ALJ made and supported his credibility determination with numerous facts, and because substantial evidence supports the ALJ's credibility determination, this factor also weighs in favor of the ALJ's decision.

### D. Education, Work History, and Age

The fourth element considered is the claimant's educational background, work history and present age.  A claimant will be determined to be disabled only if the claimant's physical or mental impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.  42 U.S.C. § 423(d)(2)(a).

At the time of the administrative hearing, Plaintiff was forty-seven years old, had a high school education, and had past work experience as a dish washer, a cook, a welder's assistant, and a maintenance worker for a college and an airport.  (Tr. 1396, 1419).   Based on his determination of Plaintiff's residual functional capacity, the ALJ posed several hypotheticals to a vocational expert ("VE") about Plaintiff's ability to engage in his past work and other work:

> ALJ: Assume with me a person with the same age, same education, same vocational background as the Claimant and further assume with me the following: Hypothetical number one, this person could perform work at the level of light as that term is defined by the U.S. Labor Department's Dictionary of Occupational Titles.  However, this person cannot be required to use the non-dominant, upper extremity except as a guide.   No climbing ropes, ladders or scaffolds or working around dangerous machinery or unprotected heights.  Mentally, this person should not be required to work around crowds.  This person should have only limited contact with coworkers, as well [as] limited contact with the public and [is] limited to one or two supervisors. Could this person do the claimant's past work?
>
> VE: No sir.  He could not.
>
> ALJ: Would there be any jobs in the national economy such a person could do?
>
> VE: In my opinion, no, there are no jobs.
>
> ALJ: Why?
>
> VE: Because using the right arm just as a guide, well, first of all, it would be the prosthesis.
>
> ALJ: I said the non-dominant, upper extremity.
>
> VE: The non-dominant?  I thought you said the right, upper extremity.
>
> ALJ: No.  I said the non-dominant.
>
> VE: Using the non-dominant as a guide and just – and do you want me to take into consideration his limited education and no English?  I think, you know, that knocks out all assembly jobs, light, assembly jobs.  The only jobs that I would think that would be like toll collector, you know, but you're dealing with the public, ticket taker, you're still dealing with the public and coworkers.  Now, if you looked at any kind

of like counter type jobs, those are all dealing with the public.  Even as a cleaner, an office cleaner, you know, using, I think you're going to have to have use of both hands.

ALJ: Full use?

VE: Full use.  Yes sir.

ALJ: Well, what about at the sedentary level, any jobs?

VE: You're looking at sedentary jobs, mostly jobs that are assembly or using the telephones and you've got to be able to speak very good English.  I'd say no jobs.

ALJ: Okay.  Hypothetical number two, assume this person can't deal with crowds but can deal with the public.  Any jobs?

VE: Parking lot attendant.  The numbers for that job would be 4,000 jobs state-wide and 190,000 jobs nationally, ticket seller, 5,000 jobs state-wide, 185,000 jobs nationally and parking lot attendant cashier, 5,000 jobs state-wide –

ALJ: You mean cubicle cashier?

VE: Yes, sir.  5,000 jobs state-wide and 185,000 nationally.
ALJ: Hypothetical number three, the same as hypothetical number two.  This time add that the work would have to be at a non-assembly line pace?

VE: Same jobs.

ALJ: Hypothetical number four, same as hypothetical number three, but add the work must be simple, routine tasks?

VE: Same jobs.

ALJ: Hypothetical number five, same as hypothetical number four, but add this person requires approximately six unscheduled breaks a day for about 10 minutes each?

VE: Would they be unable to maintain competitive employment?

ALJ: So no jobs?

VE: No jobs.

(Tr.  1419-22).  Plaintiff's representative then posed another hypothetical to the vocational expert:

21

whether, assuming the ALJ's second hypothetical and adding two to three scheduled absences a month for doctors' appointments  in addition to possibly two to three unscheduled absences per month for illness, there would be any jobs available to Plaintiff. (Tr. 1422).  The VE responded that there would not be any jobs because Plaintiff would not be able to maintain employment. *Id.*  Plaintiff argues that the ALJ's failure to consider this last hypothetical and Plaintiff's possible inability to maintain employment in formulating the RFC was in error.

The Fifth Circuit has specifically rejected that an ALJ "must in every case articulate separate and distinct findings that the applicant can perform the incidents of a job *and* that he can maintain the job over a sustained period." *Frank v. Barnhart*, 326 F.3d 618, 621 (5th Cir. 1986).  The ability to maintain employment constitutes a necessary inquiry in cases where a plaintiff can work for short periods of time, but ultimately cannot hold a job. *Frank*, 326 at 622 (citing Singletary v. Bowen, 798 F.2d 818 (5th Cir. 1986)).  There is nothing in the objective medical findings or expert testimony suggesting that Plaintiff can only work for short periods of time.  To the contrary, Plaintiff's ability to attend school for four hours during the day and study three hours at night, each for several days during a given week, directly contradicts such an assessment.  Absent any evidence in the record showing otherwise, the ALJ was under no obligation to make "separate findings on 'obtaining' and 'maintaining' a job." *Frank*, 326 at 622.  Because the ALJ properly considered Plaintiff's education, age, and work history in determining what other jobs in the national economy Plaintiff could perform, this factor also supports the decision of the ALJ that Plaintiff was not disabled.

## V.    Conclusion and Order

Considering the record as a whole, it is the opinion of this court that the ALJ properly used the guidelines propounded by the Social Security Administration, which directs a finding of "not

disabled" on these facts. *See Rivers v. Schweiker*, 684 F.2d 1144 (5th Cir. 1982). As all the relevant factors weigh in support of the ALJ's decision, as the ALJ used the correct legal standards, and as there is substantial evidence to support the ALJ's conclusion, it is ORDERED that Plaintiff's Motion for Summary Judgment (Document Nos. 34 & 36) is DENIED, Defendant's Motion for Summary Judgment (Document Nos. 33) is GRANTED, and the Commissioner's decision is AFFIRMED.

Signed at Houston, Texas, this 7th day of August, 2009

Frances H. Stacy
United States Magistrate Judge